# IN THE UNITED STATES DISTRICT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID LUBISCHER and RONDA
LUBISCHER, his wife,

                Plaintiff,

   vs.

MONSTANTO COMPANY, BAYER
CORPORATION and BAYER AG,

                Defendants.

2:23-CV-300

## COMPLAINT IN CIVIL ACTION

Plaintiffs, DAVID LUBISCHER and RONDA LUBISCHER, his wife by and through their attorneys, Peter D. Friday, Esquire, Benjamin M. Kelly, Esquire, AND Friday & Cox LLC alleges as follows:

1.     Plaintiffs bring this civil action against Monsanto Company, Bayer Corporation and Bayer AG (hereinafter collectively, "Defendants").

## FEDERAL JURISDICTION AND VENUE

2.     Federal jurisdiction is proper under 28 U.S.C. §1332 because Plaintiffs are citizens of Nebraska, a different state from the Defendants' states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interests and costs.

3.     This Court has personal jurisdiction over Defendants under Pennsylvania Law, because Defendants knew or should have known that their Roundup® products are sold throughout the Commonwealth of Pennsylvania.

4.     In addition, Defendants maintain sufficient contacts with the Commonwealth of Pennsylvania such that this Court's exercise of personal jurisdiction over them does not offend traditional notions of fair play and substantial justice.

5.      Venue is proper within this District under 28 U.S.C. §1391, because Defendant Monsanto conducts regular business in this District and consistently, regularly and systematically places its products in the stream of commerce in this District of Pennsylvania, as its contacts within this District are sufficient for personal jurisdiction over it.

## THE PARTIES

6.      Plaintiff, David Lubischer, is an adult individual who resides at 46285 385th Avenue, Lindsay, Nebraska 68644.

7.      Plaintiff, Ronda Lubischer, is an adult individual who resides at 46285 385th Avenue, Lindsay, Nebraska 68644.

8.      At all relevant times, Plaintiffs David and Ronda Lubischer are and remain married as husband and wife.

9.      Roundup® refers to all formulations of Defendants' Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2K Herbicide, Roundup® Original II Herbicide, Roundup® ProConcentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready- to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup®

VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer, Super Concentrate, Roundup® Weed & Grass Killer Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate. Defendant, Monsanto Company, ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto has transacted and conducted business within the Commonwealth of Pennsylvania and has derived substantial revenue from goods and products used therein.

10.     Defendant Bayer Corporation ("Bayer Corp.") is an Indiana corporation that has its principal place of business at 100 Bayer Boulevard, Whippany, New Jersey 08981.

11.     Defendant Bayer Corp. has transacted and conducted business within the Commonwealth of Pennsylvania.

12.     Defendant Bayer Corp. has derived substantial revenue from goods and products used in the Commonwealth of Pennsylvania.

13.     Upon information and belief, Defendant Bayer AG ("Bayer AG") is a German chemical and pharmaceutical company headquartered in Leverkusen, North Rhine, Westphalia, Germany.

14.     Upon information and belief, Defendant Bayer AG is the parent/holding company of Defendants Bayer Corp. and Monsanto Company.

15.     Upon information and belief, Defendant Monsanto Company is an indirect, wholly owned subsidiary of Bayer AG.

16.     Bayer AG is a publicly held corporation. All references to the acts and

omissions of Defendants in this Complaint shall mean and refer to the actions of Monsanto as well as any acts and omissions of Defendants Bayer Corp. and Bayer AG, made during the acquisition process as well as all acts and omissions of Defendants Bayer Corp. and Bayer AG on and after the date they acquired Monsanto. Further, Defendants Bayer Corp. and Bayer AG are jointly and severally liable with Monsanto for all acts, omissions, and wrongdoing of Monsanto as set forth in this Complaint, among other reasons, as the parent of Monsanto, as an affiliate of Monsanto, and under the doctrine of successor liability by contract, the common law, or otherwise.

17.     Defendants advertise and sell goods, specifically Roundup®, in the Commonwealth of Pennsylvania.

18.     Defendants transacted and conducted business within the Commonwealth of Pennsylvania.

19.     Defendants derived substantial revenue from goods and products used in the Commonwealth of Pennsylvania.

20.     Defendants expected or should have expected their acts to have consequences within the Commonwealth of Pennsylvania, and derived substantial revenue from interstate commerce.

21.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

22.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities within the Commonwealth of Pennsylvania, thus invoking the benefits and protections of its laws. Upon information and belief, Defendants did design, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its

dangerous and defective nature.

## FACTS

### Background

23.    At all relevant times, Defendants were in the business of, and did design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for the commercial herbicide Roundup®.

24.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's largest leading producer of glyphosate, the active ingredient in Roundup®.

25.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

26.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two (2) to three (3) days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

27.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate. Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup®, i.e. "Roundup Ready®." As of 2009, Monsanto was the world's leading producer of seeds

designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

28.     For nearly forty (40) years, farms across the world have used Roundup®, without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or the environment. Of course, history has shown that not to be true.

29.     According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup®-glyphosate--is a probable cause of cancer.

30.     However, Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

*The Discovery of Glyphosate and Development of Roundup®*

31.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general purpose herbicide for widespread commercial and consumer use.

32.     Defendants still market Roundup® as "safe," today.

*Registration of Herbicides Under Federal Law*

33.     The manufacture, formulation and distribution of herbicides, such as Roundup®®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. §136 *et seq.* FIFRA requires that all pesticides be registered

with the Environmental Protection Agency ("EPA" or "Agency"), prior to their distribution, sale, or use, except as described by the Act 7 U.S.C. §136 a(a).

34.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136 a(c)(5)(D).

35.     FIFRA defines "unreasonable effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. Section 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

36.     The EPA and the State of Pennsylvania registered Roundup® for distribution, sale, and manufacture in the United States and in the Commonwealth of Pennsylvania.

37.     FIFRA generally requires that the registrant (Monsanto in the case of Roundup®) conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

38.     The evaluation of each pesticide product distributed, sold, or manufactured, is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. Section 136a-l. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

39.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment-in relation to the reregistration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings, namely that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

40.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however the EPA made it clear that the designation did not mean the chemical does not cause cancer. "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

41.     On two (2) occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes had committed fraud.

42.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about thirty (30) tests on glyphosate and glyphosate-containing products, including nine (9) of the residue studies needed to register Roundup®.

43.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

44.     Three (3) top executives of IBT were convicted of fraud in 1983.

45.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three (3) of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

46.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

*The Importance of Roundup® to Monsanto's Market Dominance Profits*

47.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

48.    In response, Monsanto began the development and sale of genetically engineered Roundup® Ready seeds in 1996. Since Roundup® Ready crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than eighty (80) million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup® Ready seeds with continued sales of its Roundup® herbicide.

49.    Through a three (3) pronged strategy of increased production, decreased prices, and by coupling with Roundup® Ready seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five (5) to one (1), and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

50.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto s general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)    Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence around customers' driveways, sidewalks and fences.

b)    And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, bush, edging or trimming problem.

c)    Roundup® biodegrades into naturally occurring elements,

d)    Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)    This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

f)    You can apply Roundup® with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and an over 700-fold safety margin for workers who manufacture it or use it.

i)  You can feel good about using herbicides by Monsanto. They carry a toxicity rating of "practically non-toxic" as it pertains to mammals, birds and fish. "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.

51.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication that:

a)  Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b)  Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c)  Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d)  Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

52. Monsanto did not alter its advertising in the same manner in any state other than New York, and, upon information and belief, still has not done so today. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

*Evidence of Carcinogenicity in Roundup®*

53. As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

54. On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene 4.

55. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

56. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

57. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E

(evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

58.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup® products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone. In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the level of CDKl/Cyclin B Activation."

59.     The study found that Monsanto's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

60.     In 2004, Julie Marc published a study entitled, "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

61.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "since cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

62.     In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

63.     The Peixoto study suggested that the harmful effects of Roundup® on

mitochondrial bioenergetics could not be exclusively attributed to glyphosate, and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

64.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability, and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

65.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

66.    Defendants knew or should have known that Roundup® is more toxic than glyphosate alone, and that safety studies on Roundup®, Roundup®'s adjuvants, and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff, David Lubischer from Roundup®.

67.    Defendants knew or should have known that the tests, limited to Roundup®'s active ingredient glyphosate, were insufficient to prove the safety of Roundup®.

68.    Defendants failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and or the surfactant POEA to protect Plaintiff from

Roundup®.

69.    Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than the lives and well-being of Plaintiff David Lubischer, and the consuming public.

70.    Despite their knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup® as safe.

*Classifications and Assessments of Glyphosate*

71.    The IARC (International Agency for Research on Cancer) process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 Agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

72.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

73.    One (1) year before the Monograph meeting, the meeting is announced, and there is a call both for data and for experts. Eight (8) months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group Members. One (1) month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members

for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two (2) weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

74.    In assessing an agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

75.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

76.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of seventeen (17) experts from eleven (11) countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting was the culmination of nearly a one (1)-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature," as well as "data from governmental reports that are publicly available."

77.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

78.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

79.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

80.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

81.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

82.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two (2) studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

83.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

84.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product synthesis and general metabolic disruption.

85.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL) and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

86.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

    i.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in

wetlands.

ii.    It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

iii.    Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

87.    In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

88.    The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

89.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

90.    Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

91.    The IARC Monograph notes that "strong evidence exists that glyphosate, AMPA, and glyphosate-based formulations can induce oxidative stress."

92.    In 2006 Cesar Paz-y-Mifio published a study examining DNA damages in human subjects exposed to glyphosate.

93.    The study produced evidence of chromosomal damage in blood cells showing

significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

94.    The IARC Monograph reflects the volume of glyphosate pesticides' genotoxicity, noting "the evidence for genotoxicity caused by glyphosate-based formulations is strong."

95.    Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts agree that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

96.    In addition to glyphosate and Roundup®'s genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

97.    Glyphosate and Roundup®, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma ("NHL"), Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

98.    Defendants have known of this association since the early-to-mid 1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

99.    In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that the glyphosate was oncogenic. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell

leukemia.

100.   The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3:11**.**

101.   In 2003, AJ DeRoos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

102.   The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

103.   In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

104.   This strengthened previous associations between glyphosate and NHL.

105.   Despite this knowledge, Defendants continued to issue broad and sweeping statements that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements, and, in fact, voluminous evidence to the contrary.

106.   Upon information and belief, these statements and representations have been made with the intent of inducing plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendants' Roundup® for Defendants' pecuniary gain, and in fact, did induce Plaintiff, to use Roundup®.

107.   Defendants made these statements maliciously, and with complete disregard and reckless indifference to the safety of Plaintiff and of the general public.

108.   Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and

soft tissue sarcoma.

109.    Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

110.    Defendants failed to appropriately and adequately inform and warn Plaintiff of the dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries causing extreme physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medication, and of the consequent risk of death.

111.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non- genotoxic; and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

112.    Defendants claimed and continue to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendants' cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

*Recent Worldwide Bans on Roundup®/Glyphosate*

113.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will

follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, to take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

114.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

115.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

116.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been suspended."

117.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

118.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

*Monsanto's Continuing Disregard for the Safety of Plaintiff and the Public*

119.    Monsanto claims on its website that "regulatory authorities and independent

experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

120.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

121.    Glyphosate, and Defendants' Roundup® products in particular, has long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate products.

122.    Defendants' statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiff.

123.    Despite Defendants' knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup®'s purported "safety profile."

124.    Defendants' failure to adequately warn Plaintiff, resulted in (1) Plaintiff using and being exposed to glyphosate and Roundup® instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL and the consequent risk of death associated with Roundup®.

125.    Defendants failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

126.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and

consumers.

127.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect consumers' health and the environment.

128.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect consumer' health and the environment.

129.    By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup®, which caused and/or was a substantial contributing factor in causing Plaintiff to suffer from multiple myeloma, and the consequent severe physical pain and mental anguish and diminished enjoyment of life.

130.    Defendants' foregoing acts and omissions directly caused Plaintiff to sustain severe physical pain and mental anguish.

131.    By reason of Defendants' foregoing acts and omissions, Plaintiff endured severe emotional and mental anguish, and incurred medical expenses, and other economic and non-economic damages as a result of the actions and inactions of the Defendants.

132.    By reason of Defendants' foregoing acts and omissions, and by reason of, Plaintiff sustained the damages described *infra.*

## Mr. Lubischer's Use of Roundup®

133.    Mr. Lubischer was exposed to Monsanto's Roundup® products in Nebraska in the course of treating his crops, using the Monsanto products since it first came out around 2004.

134.    In particular, Mr. Lubischer applied Roundup® products from 2004 through

the present at his farm in Nebraska at 46285 385th Avenue, Lindsay, Nebraska 68644.

135.    Mr. Lubisher used Roundup® products to treat his farm to control weeds on his farm as he sprays it from the back of his tractor onto his crops, soybeans and corn at the above-listed residence about three (3) months every year (with the exception of the winter months), since 2004.

136.    Mr. Lubischer bought the Roundup® products from a company called CVA in Humphrey, Nebraska.

137.    At all times during his use of Roundup® at his properties, Mr. Lubischer used them as directed. In approximately early 2010 while living in Nebraska, Mr. Lubischer was about 50 years old and received his first diagnosis of multiple myeloma.

138.    Plaintiff was diagnosed with multiple myeloma in early 2010 when he was about 50 years old.

139.    Mr. Lubischer went through extensive treatment in 2011 and underwent a stem cell transplant. He went into remission after that for 7 years. The cancer then came back and his oncologist changed his medications and went into remission again.

140.    The cancer came back around 4-5 years ago. Mr. Lubischer has been put into immunotherapy once a month where he gets an infusion through his port. Since being diagnosed with multiple myeloma, Plaintiff is now 3 (three) inches shorter.

## CLAIM ONE
## STRICT LIABILITY (DESIGN DEFECT)

141.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.    Plaintiffs bring this strict liability claim against Defendants for defective

design.

143.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiff, David Lubischer, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched developed, manufactured, produced, tested, assembled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above. At all times relevant to this litigation, Defendants' Roundup® products were manufactured, and designed in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

144.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, and marketed by Defendants.

145.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

146.    Defendants' Roundup® products, as researched, tested, developed, designed,

licensed, manufactured, packaged, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacture and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation. At all times relevant to this action, Defendants knew or had reason to know that their Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

147. Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

> a. When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.
>
> b. When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.
>
> c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.
>
> d. Defendants did not sufficiently test, investigate, or study their Roundup® products and, specifically, the active ingredient, glyphosate.
>
> e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.
>
> f. Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.    Defendants did not conduct adequate post-marketing surveillance of their Roundup® products.

h.    Defendants could have employed safer alternative designs and formulations.

148.    Plaintiff, Mr. Lubischer, was exposed to Defendants' Roundup® products in the course of his use of said products, over many years, as described above, without knowledge of their dangerous characteristics,

149.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

150.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

151.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed its Roundup® products to make them less dangerous.

152.    At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

153.    Defendants' defective design of their Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products including the Plaintiffs.

154.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendants are strictly liable to Plaintiffs.

155.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries and illness, but for Defendants' misconduct and omissions, Plaintiff would not have developed multiple myeloma, which condition led directly to Mr. Lubischer's life diminishment.

156.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

157.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff experiences intense and prolonged pain and suffering and undergoes extensive, invasive medical procedures.

158.    Plaintiffs incurred significant expenses for medical care and treatment.

159.    Plaintiffs have suffered serious economic loss during this as a result of the multiple myeloma.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained here.

**CLAIM TWO**
**STRICT LIABILITY (FAILURE TO WARN)**

160. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

161. Plaintiffs bring this strict liability claim against Defendants for failure to warn.

162. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

163. Defendants researched, developed, designed, tested, manufactured, inspected, distributed, marketed, promoted, sold and otherwise released into the stream of commerce their Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

164. At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that their Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

165. At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing

products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

166.    At all times relevant to this litigation, Defendants failed to investigate, study, test or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiffs.

167.    Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and not known to end users and consumers, such as the Plaintiffs.

168.    Defendants knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to their products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

169.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Plaintiff, without

substantial change in their condition as designed, manufactured, sold, distributed, and marketed by Defendants.

170.   Plaintiff, Mr. Lubischer, used Roundup® products in the course of his farm and crop care maintenance, without knowledge of their dangerous characteristics.

171.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

172.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants.

173.   Defendants knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

174.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards and precautions that would have enabled persons such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks

from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

175.    To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

176.    As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff, in the course of his home care/yard work.

177.    Defendants are liable to Plaintiffs for injuries and illnesses caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

178.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff's illness, and, but for Defendants' misconduct and omissions, Plaintiff would not have developed multiple myeloma.

179.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup® products, Plaintiff could have avoided the risk of developing multiple myeloma, which could prove fatal to him, as alleged herein, and could have obtained alternative herbicides.

180.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff experiences intense and prolonged pain and suffering, and undergoes extensive,

invasive medical procedures.

181.    Plaintiffs have incurred significant expenses for medical care and treatment.

182.    Plaintiffs have suffered serious economic loss during this time as a result of the multiple myeloma.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM THREE
## NEGLIGENCE

183.    Plaintiffs incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

184.    Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted and/or used by Plaintiff.

185.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement supply, promotion, packaging, sale, and distribution of their Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

186.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in

particular, its active ingredient glyphosate.

187.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

188.    Accordingly, at all times relevant to this litigation, Defendants knew, or, in the exercise of reasonable care, should have known that the use of or exposure to their Roundup® products could cause or be associated with Plaintiff's multiple myeloma and thus created a dangerous and unreasonable risk of injury and possible death to the users of these products, including Plaintiff.

189.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

190.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

191.    Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements

concerning the safety and/or exposure to Roundup® and glyphosate.

192.    Defendants' negligence included:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing their Roundup® products without thorough and adequate pre-and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposures to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup® glyphosate as an herbicide;

e.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to its Roundup® products;

g.    Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.    Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i.    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.    Representing that its Roundup® products were safe for their intended

use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.     Continuing to disseminate information to their consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries, or in-home use; and,

n.      Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

193.    Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries and, possible death, as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

194.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

195.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs are suffering, and will continue to suffer, as described herein.

196.    Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendants' reckless conduct therefore warrants an award of punitive damages.

197.    As a direct and proximate result of Defendants' wrongful acts and omissions,

Plaintiff experiences intense and prolonged pain and suffering and undergoes extensive, invasive medical procedures.

198.    Plaintiffs incurred significant expenses for medical care and treatment.

199.    Plaintiff suffers serious economic loss during this as a result of the multiple myeloma and diminishing lifestyle.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM FOUR
## BREACH OF IMPLIED WARRANTIES

200.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

201.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting their Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products in the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

202.    Before the time that Plaintiffs were exposed to the use of their aforementioned Roundup® products, Defendants impliedly warranted to their consumers- including Plaintiffs-that their Roundup® products were of merchantable quality and safe and fit for the use for which they were intended: specifically, as horticultural herbicides.

203.    Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and

glyphosate-containing products carries an increased risk of developing severe injuries, and an increased risk of death including Plaintiff's injuries and illness.

204.    Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

205.    Upon information and belief, Plaintiffs were at all relevant times in privity with Defendants.

206.    Plaintiffs were the intended third-party beneficiary of implied warranties made by Defendants to the purchasers of its horticultural herbicides, and as such, Plaintiffs, are entitled to assert this claim.

207.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendants.

208.    At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiffs, would use Roundup® products as marketed by Defendants, which is to say that Plaintiffs were a foreseeable user of Roundup®.

209.    Defendants intended that their Roundup® products be used in the manner in which Plaintiffs in fact used them, and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

210.    In reliance upon Defendants' implied warranty, Plaintiffs used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

211.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate.

212.    Defendants breached their implied warranty to Plaintiffs in that their Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries and death, as complained of herein.

213.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than 218 alternative products.

214.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff experiences intense and prolonged pain and suffering, and undergoes extensive, invasive medical procedures.

215.    Plaintiffs incurred significant expenses for medical care and treatment.

216.    Plaintiff suffered serious economic loss as a result of the multiple myeloma.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM FIVE
## BREACH OF EXPRESS WARRANTIES

217.    Plaintiffs incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

218.    The law imposes a duty upon Defendants to be responsible in the event the

product sold, namely Roundup®, is unfit for the use and purposes intended.

219.    Defendants breached their contractually-assumed warranty by supplying a product that caused Plaintiff, to suffer from multiple myeloma.

220.    Any warranty disclaimer or limitation of liability clause offered by Defendants for a product as dangerous as Roundup® is unconscionable and unenforceable by law.

221.    Defendants expressly warranted, and continues to warrant, via affirmations of facts and promises in their advertisements, marketing, promotions, and in their packaging, that Roundup® products are fit for the ordinary purpose in which such goods are used, when used in accordance with the directions accompanying the Roundup® products.

222.    Defendants' express warranties became part of the basis of the bargain between Defendants and Plaintiffs.

223.    Defendants offered an express warranty as to the quality, safety and design of their product at a time when they knew Roundup® products suffered from serious defects and posed a serious risk of harm and death to persons similarly situated to Plaintiffs. Nevertheless, Defendants continued to market and sell their Roundup® products as advertised as safe and free from deleterious effects. Defendants also provided and/or continue to provide a label with their Roundup® products, specifically warranting their Roundup® products as being reasonably fit for their intended purposes.

224.    As set forth above, Defendants' warranty fails in its essential purpose and, accordingly, Plaintiffs cannot and should not be limited to any warranty disclaimer or limitation of liability clause which Defendants may attempt to assert.

225.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff experiences intense and prolonged pain and suffering and undergoes extensive,

invasive medical procedures.

226.    Plaintiffs incurred significant expenses for medical care and treatment.

227.    Plaintiff suffers serious economic loss during this as a result of the multiple myeloma.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM SIX
## LOSS OF CONSORTIUM

228.    All preceding paragraphs are incorporated by reference.

229.    As a direct and proximate result of defendants' actions as aforesaid, wife plaintiff has sustained the following damages, some or all of which may be continuing:

a)    She has been required, and may continue to be required, to expend money for medical care, services and supplies for treatment of her husband's injuries;

b)    She has been deprived of the services, assistance and companionship of her husband; and

c)    She has suffered and may continue to suffer emotional stress, tension, and anxiety.

WHEREFORE, wife plaintiff demands judgment against defendant in an amount in excess of the jurisdictional limits for compulsory arbitration, together with Court costs, interest and all other relief as permitted by this Honorable Court.

## PUNITIVE DAMAGES

230.    Plaintiffs incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein. At all times material hereto, Defendants knew

or should have known that the subject product was inherently dangerous with respect to its health risks.

231.    At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

232.    Defendants' misrepresentations included knowingly withholding material information from the public, including the Plaintiffs, concerning the safety of the subject product.

233.    At all times material hereto, Defendants knew and recklessly disregarded the fact that human exposure to Roundup® can and does cause health hazards, including multiple myeloma and possible death.

234.    Notwithstanding the foregoing, Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risk.

235.    Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®.

236.    Defendants intentionally concealed and/or recklessly failed to disclose to the public, including Plaintiffs, the potentially life-threatening hazards of Roundup® in order to ensure continued and increased sales.

237.    Defendants' intentional and/or reckless failure to disclose information deprived Plaintiffs of necessary information to enable Plaintiffs to weigh the true risks of using or being exposed to the subject product against its benefits.  As a direct and proximate result of

Defendants' wrongful acts and omissions, Plaintiff experiences intense and prolonged pain and suffering and undergoes extensive, invasive medical procedures.

238.    Plaintiffs incurred significant expenses for medical care and treatment.

239.    Plaintiff suffers serious economic loss during this as a result of the multiple myeloma.

240.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

Respectfully submitted,

By:    /s/ Peter D. Friday

Peter D. Friday, Esquire
PA I.D. 48746
pfriday@fridaylaw.com
Benjamin M. Kelly, Esquire
PA I.D. 328766
bkelly@fridaylaw.com

*Counsel for Plaintiff*

Friday & Cox LLC
1405 McFarland Road
Pittsburgh, PA 15216
Ph (412) 561-4290
Fx (412) 561-4291